**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

CURRY MANGO INC
Florida Profit Corporation
d/b/a CURRY MANGO

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues CURRY MANGO INC, Florida Profit Corporation, d/b/a CURRY MANGO ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.mycurrymango.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 6625 Florida Ave S, Lakeland, FL 33813 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an

> arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Profit Corporation with a principal place of business of 6625 Florida Ave S, Lakeland, FL 33813 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates an Indian restaurant under the name Curry Mango at Defendant's Principal Place of Business. Defendant provides food and beverages to the public, including chicken and lamb curries, tandoori dishes, rice dishes,

vegetarian entrées, and desserts. Defendant operates Defendant's Website, which provides information about its restaurant and includes catering request form.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates its restaurant from its Principal Place of Business in Lakeland, Florida, and maintains Defendant's Website as a digital extension of that physical establishment. Defendant's Website is accessible to consumers nationwide and provides information concerning Defendant's restaurant and the goods and services available at its physical location. The Website includes catering request form through which consumers can enter the number of people and select a date and time for catering service. The Website also allows consumers to purchase carryout and review menu offering. Defendant's Website is operated in connection with Defendant's Principal Place of Business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to obtain information about Defendant's restaurant and request catering service from Defendant's restaurant, the same functions available to non-disabled customers. The catering form's date calendar could not be fully operated by keyboard, and the time options were announced as "blank" by the screen reader, preventing MACON from independently selecting a date and time. Defendant's

failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. July 28, 2026;

b. August 07, 2026;

c. August 23, 2026; and

d. September 10, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on August 7, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the

opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: “No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns,

leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 1..

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides information about the restaurant and access to its catering request form. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to shop and pre-shop Defendant's food and beverage offerings and book a visit to Defendant's restaurant through Defendant's Website from home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in

or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or

would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled

persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Missing Pause, Stop, and Hide Controls for Auto-Rotating Slider Content**

i. **Issue:** The slider content rotates automatically without providing any mechanism to pause, stop, or hide the moving content. Users who require additional time to read or process the displayed information have no means of controlling the automatic movement. This absence of user control creates a significant accessibility barrier for keyboard users, screen reader users, users with low vision, and users with cognitive

disabilities, as the content advances before they are able to finish reading or interacting with it.




ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** Users who are blind and rely on screen readers are disproportionately affected by the absence of pause, stop, or hide controls for the auto-rotating slider. As the slider advances automatically, screen reader users are unable to complete their interaction with the current content before it is replaced, resulting in lost or inaccessible information. Keyboard users, users with low vision, and users with cognitive disabilities face the same barrier, as the content changes before they can finish reading or engaging with it. The slider should provide a visible and keyboard-accessible Pause/Play button that allows users to stop and restart the automatic rotation at any time. This control should be

positioned before or within the slider interface and must function reliably for both keyboard and screen reader users. The slider should remain paused until the user actively chooses to resume it. The control must also carry a clear and descriptive accessible name that reflects its current state, such as "Pause slideshow" or "Play slideshow," so that all users understand its purpose and current action.

**b. Incomplete Alt Text for Restaurant Image**

i. **Issue:** The restaurant image is rendered with incomplete alternative text that fails to convey sufficient information about the image's content or purpose. Users who rely on screen readers depend entirely on alternative text to understand the meaning and context of images. When alternative text is incomplete or inadequate, users who cannot see the image are denied the same informational experience available to sighted users, resulting in an accessibility barrier and an inequitable user experience.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Users who are blind and rely on screen readers are directly and significantly affected by the incomplete alternative text on the restaurant image. Without accurate and descriptive alternative text, blind users are unable to determine the content or purpose of the image, resulting in a fundamentally unequal experience compared to sighted users. This gap in information access can prevent blind users from fully understanding the context of the page. The image should be assigned clear and complete alternative text that accurately describes its content or communicates its purpose in a concise manner. If the image conveys meaningful information, the alternative text must reflect that information accurately. If the image is purely decorative, it should be assigned an empty alt attribute (alt="") so that screen readers

bypass it entirely. This ensures that all users, including those who rely on assistive technologies, receive equivalent access to the information presented on the page.

**c. Incorrect spinbutton Role for Edit Fields**

i. **Issue:** The Phone Number and Number of People input fields are incorrectly exposed to assistive technologies using the spinbutton role rather than the appropriate edit or textbox role. These fields do not provide spinner controls, nor do they support the standard keyboard interactions associated with the spinbutton role, such as incrementing or decrementing values. The assignment of an incorrect role causes screen reader users to receive inaccurate information about the nature and expected behavior of these fields. Users may anticipate spinner functionality that is not present, creating confusion and making it impossible for them to understand how to interact with the fields correctly.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** Users who are blind and navigate using screen readers are directly harmed by the incorrect spinbutton role assigned to the Phone Number and Number of People fields. When a screen reader announces an incorrect role, blind users receive misleading information about how a field is intended to be used, causing confusion and potentially preventing successful form completion. A blind user expecting spinner functionality—such as the ability to increase or decrease a value using arrow keys—will be unable to interact with the field as anticipated, as that functionality does not exist. The Phone Number field should be exposed using the edit or textbox role, as users are required to enter text or numeric characters directly into the field. It must not be identified as a spinbutton unless genuine

increment and decrement controls are implemented. The Number of People field should only use the spinbutton role if it fully supports value adjustment through both keyboard and assistive technology interactions. Otherwise, it must also be exposed as an edit or textbox field. The announced role must accurately reflect the actual behavior of the control at all times to ensure that all users can interact with it effectively and with confidence.

**d. Missing Keyboard Support for the Our Services Link**

i. **Issue:** The Our Services link is inaccessible via keyboard and cannot be operated using a screen reader. Keyboard users are unable to move focus to the link, making it impossible to activate without the use of a mouse. Screen reader users are equally unable to reach or interact with the link through standard navigation methods. This creates an absolute accessibility barrier for all users who depend on keyboard-only access or assistive technologies to navigate and interact with page content.




ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** Users who are blind and rely on screen readers, as well as keyboard-only users, are completely excluded from accessing the Our Services link due to the absence of keyboard support. For blind users who navigate exclusively through assistive technologies, the inability to reach or activate this link means they are denied access to content or functionality that is otherwise available to sighted mouse users. This represents a fundamental and unacceptable disparity in access. The Our Services link must receive keyboard focus when users navigate using the Tab key. Screen readers must announce the link with its correct accessible name and role so that users understand its purpose before activating it. Users must be able to activate the link using the Enter key without requiring a mouse or pointer

device. These measures are essential to ensuring that all users, regardless of their mode of interaction, can access the same content and functionality.

### e. Missing New Window Indication for Social Media Links

i. **Issue:** The social media links open in a new browser window or tab without communicating this behavior to users prior to activation. Screen reader users and keyboard-only users receive no advance notification that selecting a link will result in a new window or tab being opened. Consequently, affected users may be unable to understand why a new browser window or tab has appeared or determine their current location within the browsing environment after activating the link. Users must be informed of any link behavior that results in the opening of a new window or tab before they choose to activate it.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** Users who are blind and rely on screen readers are particularly disoriented when a link opens a new browser window or tab without prior notification. For blind users, an unexpected change in browser context—such as the appearance of a new window or tab—can be deeply confusing, as they may lose track of their position within the page or be unaware that their browsing environment has changed. This lack of advance notice undermines their ability to navigate independently and with confidence. Social media links that open in a new browser window or tab must clearly communicate this behavior to users before the link is activated. The accessible name or visible link text should include explicit information such as "(opens in a new window)" or "(opens in a new tab)." Screen reader users must receive this same information through the accessible name or another accessible method. Providing this notification ensures that all users, including those who are blind, are fully

informed of what will occur before they choose to activate the link.

**f. Incorrect Role Defined for Time Picker**

i. **Issue:** The Time field is visually and functionally implemented as a time picker with selectable time options; however, it is exposed to assistive technologies as an edit field. NVDA announces the control as "Time edit blank" rather than identifying it as a combobox, creating a fundamental mismatch between the control's actual functionality and its programmatic representation. This discrepancy prevents screen reader users from understanding the true nature of the control and how it is intended to be operated.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind and rely on NVDA or other screen readers, the incorrect role assignment renders the Time picker effectively unusable. Because the control is announced as a plain edit field rather than a combobox, blind users have no means of understanding that selectable time options are available, nor can they determine the correct method of interaction. The absence of accurate role information deprives these users of the ability to independently and accurately complete time-sensitive form tasks. The Time picker must be programmatically identified as a combobox, with the appropriate accessible name, role, and expanded or collapsed state communicated to assistive technologies so that blind users can interact with the control on equal terms.

**g. Time Picker Automatically Expands Time Options on Keyboard Focus**

i. **Issue:** When keyboard focus is moved to the Time field, the list of available time options automatically expands without any explicit user action. This automatic expansion upon focus produces unexpected behavior that disrupts the

anticipated keyboard interaction pattern, making it impossible for keyboard and screen reader users to predict or consistently interact with the control.




ii. **WCAG 2.1 AA Violations:** 3.2.1 - A - On Focus

iii. **Impact:** For users who are blind and navigate interfaces exclusively via keyboard and screen reader, unexpected changes in context triggered by focus alone present a significant barrier. When the Time picker expands automatically upon receiving focus, blind users are immediately confronted with an unpredictable environment that interrupts their workflow and forces them to reorient within the interface. This behavior violates the fundamental expectation that focus alone should not initiate a change of context. The Time field must receive keyboard focus without automatically expanding the list of time options. The

dropdown should only be displayed when the user explicitly activates the control, such as by pressing Alt + Down Arrow, Down Arrow where appropriate, or by activating the expand button, thereby restoring predictability and control for blind and keyboard-dependent users.

**h. Screen Reader Focus Does Not Reach Time Options in Time Combobox**

i. **Issue:** When the Time picker is expanded, keyboard users can navigate through the available time options using the arrow keys; however, when a screen reader such as NVDA is active, screen reader focus does not move to the individual time options. Instead, NVDA announces only "blank" during arrow key navigation. This behavior makes it entirely impossible for screen reader users to identify, review, or select any of the available time options.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A, 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind, the failure of screen reader focus to reach individual time options within the expanded Time picker constitutes a complete and insurmountable barrier to task completion. Because NVDA announces only "blank" during navigation, blind users receive no information about the available time values, cannot determine which option is currently focused, and are unable to make a selection. This effectively excludes blind users from independently completing any form or booking process that requires time selection. Each time option must expose an appropriate accessible name, role such as option, and state such as selected or focused, so that screen readers can accurately announce the available time values and allow blind users to navigate and select options with full independence.

**i. Missing Keyboard Support for the Calendar**

i. **Issue:** The calendar component cannot be fully operated using a keyboard and screen reader. Keyboard users are unable to navigate between dates, change months, or select a date without the use of a mouse. Screen reader users receive no meaningful information regarding the current month, selected date, available dates, or disabled dates, creating an absolute barrier for users who are unable to operate a pointing device.




ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** For users who are blind, the absence of full keyboard support within the calendar component represents a total exclusion from date selection functionality. Blind users depend entirely on keyboard navigation and screen reader announcements to interact with interface components; without these, they cannot move between dates, advance or

retreat through months, or confirm a date selection. The lack of announced information regarding the current month, selected state, unavailable dates, and dynamic updates further compounds this barrier, leaving blind users without the context necessary to complete date-dependent tasks independently. The calendar must be fully operable via keyboard alone, with visible and logically ordered focus management, and screen readers must announce the current month, date values, selected state, unavailable dates, and all relevant updates when the month or date changes.

### j. Multiple H1 Headings Defined on the Page

i. **Issue:** The page contains more than one H1 heading. The H1 heading is intended to identify the primary topic of the page and serve as the definitive starting point for the content structure. When multiple H1 headings are present without a valid structural justification, the page's content hierarchy becomes ambiguous, preventing screen reader users from clearly identifying the main purpose of the page and creating a significant barrier for those who rely on headings to navigate and comprehend page content.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers to navigate by heading structure, the presence of multiple H1 headings on a single page introduces confusion and undermines the ability to efficiently orient within the content. Blind users frequently use heading navigation as a primary means of understanding page organization and locating relevant sections; when multiple H1 headings exist without a clear and logical hierarchy, these users cannot determine the primary subject of the page or navigate its content with confidence. Each page must contain only one H1 heading representing its main topic, with all subsequent headings following a logical and consistent hierarchy using H2, H3, H4, and further levels as appropriate to the content structure,

ensuring that blind users can accurately interpret the page's organization and navigate its content independently.

**k. Missing H1 Heading on the page**

i. **Issue:** The page does not contain a Level 1 Heading (), which screen reader users rely upon to quickly understand the main purpose of a page and confirm they have arrived at the correct destination. Without an H1 heading, users are unable to identify the primary topic of the page through heading navigation, resulting in an inconsistent page structure that significantly reduces the accessibility of the content. Every page should contain one descriptive Level 1 Heading () that clearly identifies the main purpose or topic of the page. The H1 heading should appear first in the page structure and accurately describe the page content, followed by a proper heading hierarchy using H2, H3, and lower-level headings as needed, enabling screen reader users to understand the page structure and navigate the content efficiently.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers, the absence of an H1 heading creates a significant navigational barrier, as heading navigation is one of the primary methods used to orient themselves on a page and confirm its relevance to their needs. Without an H1 heading, blind users cannot determine the primary topic of the page through their assistive technology, forcing them to navigate through the entire page content without structural guidance. This results in a disorienting and inefficient experience that undermines their ability to access and understand the page independently.

**l. Unnecessary Heading Markup Used for Restaurant Text**

i. **Issue:** The "Restaurant" text has been marked up as a heading despite not introducing a new section or serving to organize the page content in any meaningful way. This causes screen reader users to encounter an extraneous heading announcement that serves no structural purpose. As users frequently rely on heading navigation to move efficiently between important sections of a page, the presence of unnecessary heading markup makes it impossible for them to accurately interpret the page structure and navigate its content with confidence. Only content that genuinely introduces a new section or topic should be marked up as a heading. If the "Restaurant" text functions solely as a visual label or plain text, it should not carry heading markup. Applying heading markup exclusively where it is semantically appropriate ensures a clear and meaningful page structure, allowing screen reader users to navigate the content correctly.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and depend on screen readers, the presence of unnecessary heading markup on the "Restaurant" text creates a misleading and disorienting navigational experience. When a screen reader announces this text as a heading, blind users are led to believe it marks the beginning of a new section, causing confusion when no corresponding content or structural change follows. This misrepresentation of the page structure undermines the reliability of heading navigation, which is a critical tool for blind users to efficiently orient themselves and move through page content, ultimately impeding their ability to independently and accurately understand the layout of the page.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about August 1, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on August 7, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA-compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's

Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with

visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to

ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a

statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

**Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing**

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: The firm's case-management software uses AI to populate documents with case-specific information from the firm's records, creating a preliminary draft. Before filing, the signing attorney independently verifies that information against the underlying records, makes any necessary revisions, and reviews and finalizes the document. This automated population process does not perform legal research or generate case citations. The attorney then continues working on the document, reviewing all initial entries, and finalizing it before filing. The Case Management Software input does not involve legal research or case citations. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case

that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.

Dated: October 12, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**